UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

WINFIELD GRAIN, INC., et al.,          )
        Plaintiffs,          )
                )
    v.          )          No.    4:11CV2244 TIA
                )
MARQUETTE TRANSPORTATION CO., LLC,          )
        Defendant.          )

## MEMORANDUM AND ORDER

Before the Court are Plaintiffs Winfield Grain, Inc. and Kevin and Phyllis James (hereinafter "Plaintiffs"), who have filed a civil action alleging damages, and Defendant Marquette Transportation Co., LLC (hereinafter "Defendants"). The undersigned United States Magistrate Judge has jurisdiction over this case by consent of the parties in accordance with 28 U.S.C. §636(c).

On May 10, 2010, July 22, 2011, and July 23, 2011, boats owned by the Defendant collided[1] with physical property owned by the Plaintiffs on the Mississippi River. Defendant has admitted fault for these allisions. (Joint Stipulation of Uncontested Facts ("Stip.") at ¶ 15, ECF No. 81) Therefore, the only issue before the court is the amount of damages. The case was tried before the Court without a jury from October 7, 2013 to October 11, 2013.

Pursuant to Federal Rule of Civil Procedure 52, the Court now finds and concludes as follows:

---

[1] The parties refer to the incident as an "allision." Allision has traditionally been defined as "the contact of a vessel with a stationary object such as an anchored vessel or a pier. *Black's Law Dictionary* (9th ed. 2010). In modern practice, "collision" is often used where "allision" was once the preferred term. Id.

# FINDINGS OF FACT

*Jurisdiction and Parties*

1. The Plaintiffs in this action are Winfield Grain, Inc., a Missouri corporation[2], and Kevin and Phyllis James.

2. The Defendant in this case is Marquette Transportation Co., LLC, a Missouri Limited Liability Company.

3. The collisions occurred on the banks of the Mississippi River, with equipment and facilities located at Winfield, Missouri, ("Winfield") which is within the Eastern District of Missouri.

4. Plaintiff owns another business called "Lincoln County Sand & Gravel" ("Lincoln County"), a Missouri corporation that sells sand from a land-based pit to the concrete and asphalt industry.

*The Winfield Property*

5. Kevin James ("James") purchased the Winfield Grain facility on May 19, 2008 for $710,000.00. (Stip. at ¶ 1, ECF No. 81) The Winfield Grain facility was originally constructed in 1965. (Id. at ¶ 3) The property is titled to James and his wife Phyllis James. (Id. at ¶4) The Winfield property includes approximately 22 acres of land near Winfield, Missouri. (Id. at ¶ 5) On the property, 8 grain silos have been built, along with

---

[2] At the outset, the Court finds that Winfield Grain, Inc. suffered no property damages as a result of the events underlying this litigation. As will be explained in this opinion, the property and the assets at issue here were titled either in the name of the James' personally, or in Lincoln County Sand and Gravel, the Plaintiffs' other business. At the close of the Plaintiffs' evidence, the Defendant moved for a directed verdict, Judgment as a Matter of Law pursuant to Rule 50 of the Federal Rules of Civil Procedure, and Plaintiffs did not oppose this motion. (Trial Transcript ("Tr"), Vol. 3, 65:14, ECF No. 113) Thus, all damages were to the James' personally, or to Lincoln County Sand and Gravel.

a barge loading dock and a 420-foot conveyor, meant to transport grain from the silos to the river for barge loading. (Id. at ¶¶ 8-11) The barge loading dock at the river end of the conveyor consisted of six wood piling clusters for barge mooring-which are called "dolphins"; it also included slide lines between dolphins 1 and 5A (to secure a barge for loading), and a control booth/loading tower for pouring grain from the conveyor into a barge. (Id. at ¶¶ 11, 16, 20)

6. James purchased the Winfield Grain facility from Jersey County Grain, Inc., which had previously operated the property as a grain storage facility. He secured financing through Enterprise Bank. The financing consisted of two loans. One was in the name of Lincoln County for $305,100.00; the other was a personal loan to Kevin James and his wife Phyllis, in the amount of $465,918.50. (Tr. Vol. 1, 118-119, ECF No. 111; Stip. at ¶ 2, ECF No. 81)

7. The Court finds that plaintiffs intended to operate Winfield as a granary similar to Jersey County's operation and also planned to dredge sand from the Mississippi River bed near Winfield for sale to various commercial entities that purchase such sand. (Tr. Vol. 1, 120, ECF No. 111)

8. Winfield Grain, Inc. was organized to operate the Winfield facility on September 14, 2009. (Stip. at ¶ 6, ECF No. 81) James is the sole member of the Board of Directors for Winfield Grain and the only officer. (Id. at ¶ 7)

9. In September, 2008, the facility was flooded, rendering the facility inoperable. However, the facility was repaired, except for a truck scale, in the fall of 2010. (Id. at ¶ 13)

10. The cleanup costs from the September 2008 flood were approximately $250,000, based upon a bid that James had solicited from a company named "ServiceMaster." (Tr. Vol. 1,

121, ECF No. 111)  In the end, however, the plaintiff cleaned up the facility himself, at a cost of $100,000.  During this process, the plaintiff received a $250,000 disbursement from his flood insurance for damages from the flood.  (Id. at 159)  The record is unclear as to what happened with the remaining $150,000.

11. Prior to the 2010 allision, there were six pile clusters or "dolphins" at the Winfield facility (Dolphins #1, #2, #3, #4, #5A, and #6).  The original dolphin #5 was sawed off and abandoned in 2003.  Dolphin #5 is not the subject of recovery claims in this case.  Regarding the dolphins at issue in this case:

    a.  Dolphin #1 was installed in 1983.  It was comprised of nine greenheart piles.

    b.  Dolphin #2 was installed in 1983.  It was comprised of nine greenheart piles.

    c.  Dolphin #3 was installed in 1964.  It was comprised of nine greenheart piles in the interior and six used, treated yellow pine piles around the exterior.

    d.  Dolphin #4 was installed in 1964.  It was comprised of nine greenheart piles in the interior and six used, treated yellow pine piles around the exterior.

    e.  Dolphin #5A was installed in 2003.  It was comprised of ten greenheart piles.

    f.  Dolphin #6 was installed in 1964.  It was comprised of nine greenheart piles in the interior and six used, treated yellow pine piles around the exterior.  (Stip. at ¶ 20, ECF No. 81)

12. The Court finds that the useful life of greenheart pile clusters, under the conditions present at the Winfield facility, is approximately 45 years.

13. The property was appraised at $725,000 in 2008 ("Westover Appraisal").  (Def.'s Mem. in Opp'n to Pls.' Mot. To Exclude Ex. 10, p. 3, ECF No. 83-10)

*Plaintiffs' Other Business*

14. James also owns Lincoln County Sand & Gravel ("Lincoln County"), a company that sells sand from a land-based pit to the concrete and asphalt industry. James has 15 years' experience running a land-based sand and gravel business. (Stip. at ¶¶ 14, 17, ECF No. 81)

15. James did not have a regular salary from Lincoln County, but instead reported as income whatever money he had left after expenses were paid. In 2010, these "profits" were $66,000; in 2011, they were $76,000; in 2012, they were $86,000. (Tr. Vol. 1, 141, ECF No. 111) During this time, however, James also had some significant repairs to make, and he made payments on the promissory note for the Winfield property out of Lincoln County revenues. Thus, the true profits from Lincoln County are difficult to measure. Relevant, however, is the fact that Lincoln County required loans from family members, which James never paid back, in order to meet operational cash flow needs. (Id. at 141-142)

*The Allisions and Damage to the Winfield Facility*

16. The first allision, on May 10, 2010, affected the two southern-most pile clusters (pile clusters 5A and 6), causing one to lean down river approximately 15 degrees off vertical and breaking the other, causing it to lay beneath the waterline, and the winch system attached to one of these pile clusters was damaged. (Stip. at ¶ 16, ECF No. 81)

17. The Court finds that after the May, 2010 allision, dolphins 5A and 6 were damaged to such an extent that they could no longer be used for their intended purpose.

18. The subsequent allisions, on July 22-23, 2011, knocked down the loading tower, one-third of the conveyor system (approximately 120 feet) and adjacent catwalk, the loading tower used to load barges, and the remaining four northernmost pile clusters in the river used to move and moor barges during loading. (Stip. at ¶ 16 )

19. Following the July 2011 allisions, the facility was no longer able to load barges. (Stip. at ¶ 18)

20. Marquette has admitted fault for its barges alluding with the Winfield facility on May 10, 2010 and July 22-23, 2011.

21. Much of the preceding is agreed upon by the parties, but they then differ zealously on their assessment of the value of the property before the collisions, the proper methods for valuing the assets, and thus the damages that Plaintiffs sustained.

22. In proving the damages to the Winfield facility, the Plaintiffs offered the expert testimony of James Manley. Mr. Manley testified, in addition to the general nature of the damages, that the appraisals by both the Defendant in this case, and by 3rd parties previous to the allisions in this case (namely, the Westover Group), undervalued the Winfield property, although he declined to give a value himself. He also testified that many of the assets at Winfield should not be subject to depreciation in their valuations. (Tr. Vol. 1, 8-29) Much of this testimony is directly contrary to the expert testimony of David Maybury, John Stockmann, and Barry Rollins. To the extent that his testimony conflicts with those witnesses, the Court finds that Manley's testimony, especially regarding depreciation, is not credible.

23. The Plaintiffs also offered the expert testimony of Neil Anderson, in proving the damages to the Winfield facility. Mr. Anderson, who was employed by Manley Brothers, on

behalf of the Plaintiffs, described the bidding process used to get quotes to repair the facility. He also presented an Order of Magnitude, which was his estimate of what a reasonable amount to repair the facility should be. The court finds that his Order of Magnitude is a reasonable approximation of the cost to repair the Winfield facility. (Tr. Vol 2, 42-57, ECF No. 112)

24. Relevant to the damage caused by the first allision in May, 2010, the defendant offered the expert testimony of David Maybury. The court finds that Mr. Maybury is qualified as an expert independent marine surveyor. Mr. Maybury testified as to the damages suffered as a result of the 2010 allision. He also testified as to the general condition of the loading facility and the dolphins. In particular, he testified as to the worn-down condition of pile clusters 3 and 4 before the 2010 allision, and to the somewhat less worn-down condition of pile clusters 1 and 2. He asserted that 3, 4, and 6 had used up their useful life based upon his expert opinion that based on the construction of the greenheart piles and the usage patterns at the Winfield facility, the useful life of the clusters was 45 years. (Tr. Vol. 3, 100-03, ECF No. 113) The Court finds this testimony credible.

25. Relevant to the damage caused by the second and third allisions, which happened in July, 2011, the Defendant offered the expert testimony of John Stockmann. The court finds that Mr. Stockmann is qualified as an expert independent marine surveyor. He testified as to the effects of the 2011 allisions on the four remaining clusters that had not been injured in the 2010 event, along with the damage to the conveyor and loading spout. He also concurred with the testimony of Mr. Maybury regarding the depreciated condition of pile clusters 3, 4, and 6 based upon evidence from before the 2010 allisions. (Tr. Vol. 4, 3-34, ECF No. 114) The Court finds Mr. Stockmann's testimony to be credible.

26. In evaluating the total damages suffered by the facility as a result of the three allisions, the defendant offered the expert testimony of Barry Rollins. Mr. Rollins testified as to the pre-2011 allision fair market value of the Winfield facility, as compared to the post-2011 allision fair market value. He found that the difference in market price was $82,701. In other words, he found that there was $82,701 worth of damages from the two July 2011 allisions. He also testified as to the appropriateness of depreciation in valuing the facility and damages. He testified that pile clusters 3 and 4 had no value before the 2011 allisions because they were fully depreciated. (Tr. Vol. 5, 12-13, 18 , ECF No. 115) The Court finds Mr. Rollins' testimony credible.

*Plaintiff's Planned Business Operations*

27. The Court finds that the Plaintiffs intended to use the Winfield property to run a grain storage and loading facility, and also to dredge sand from the Mississippi River for sale. James claims that he expected to earn $100,000 a year on both the grain side of the business and the sand dredging side of the business. (Pls.' Proposed Findings of Fact and Conclusions of Law ¶¶ 28-29 , ECF No. 119) Plaintiffs assert the grain operation would have been operational in September of 2010, and the sand operation six months later, for a total lost profits of $750,000. (Id. at ¶ 33)

28. In evaluating these plans, the Plaintiffs offered the expert testimony of Leroy Grossman. The Court finds that Mr. Grossman is qualified as an expert witness in assessing the economic and business prospects of new commercial entities. Mr. Grossman testified that he spoke with the James', bank personnel, as well as potential business partners of the James'. He testified that in his opinion, the business operations at Winfield would have been a success, and that the company would have earned at least $100,000 annually,

on each side of the business, the grain side, and the sand side. However, the Court finds that Mr. Grossman has merely repeated the claims that the Plaintiffs are making, and he had no independent basis for his opinion other than information from the James'. All of the sources that Mr. Grossman talked to originally received their information from Mr. James; and Mr. Grossman made no independent attempt to ascertain the potential revenues or likely expenses of the operation. (Tr. Vol. 2, 3-37, ECF No. 112) As such, Mr. Grossman's testimony is not credible.

29. Also relevant to the James' future business operations was the testimony of Della Moon, an employee of Enterprise Bank, who helped secure the loan for financing of the purchase of the Winfield facility. Ms. Moon testified that as part of the loan application process to purchase the Winfield facility, there were certain underwriting criteria that had to be met. She testified that she analyzed the prospects of this new business, including cash flow potential and market conditions as part of the underwriting process. Ms. Moon's opinions of the business prospects of the Winfield facility were positive. She also testified that all of the payments on the loan had been made at the time of trial. The Court finds that Ms. Moon is credible, but her testimony is not entitled to much weight. Overridingly, this is because the bank was heavily secured in its loan, having a mortgage on the Winfield facility and Lincoln County's assets, as well as the assets of the James' personally. Thus, the bank had little risk in lending the money. Given the long business relationship between various members of the James family in many different endeavors and over the course of multiple decades, the bank also had an interest in extending the loan to the James' and Lincoln County. (Tr. Vol. 3, 38-56, ECF No. 113)

30. Relevant to the proposed businesses, the Plaintiffs also offered the testimony of Jeff Geisendorfer, who is the managing director of the Lincoln County Farmers' Co-Op. He testified that he had intended to do business with Winfield Grain on an ongoing basis, before his organization ceased operations. In fact, however, Mr. Geisendorfer did not do business with the James' apart from their one-time storage arrangement. The Court finds that Mr. Geisendorfer's testimony is credible, but that nonetheless no binding commitment existed between the parties to do business in the future. There were no contacts between the parties that rose to a level beyond preliminary negotiations and speculation. (Tr. Vol. 3, 8-29, ECF No. 113)

31. Relevant to the proposed sand business, the Plaintiffs offered the testimony of Kenneth Schreiter. Mr. Schreiter is a long-time business and personal acquaintance of the James', who owns a concrete mixing company. He buys sand and offered testimony that his company may have bought "river sand" from the James'. The Court finds that Mr. Schreiter's testimony is credible, but not entitled to much weight. The parties entered into no binding commitments, and none of the contacts between the parties amounted to anything more than preliminary negotiations and speculation about future courses of action. (Tr. Vol. 2, 107-121, ECF No. 112)

32. The Defendant offered the expert testimony of Frank Reedy in evaluating the Plaintiffs' proposed business plan. The Court finds that Mr. Reedy is qualified as an expert witness in the evaluation of prospective business operations. He testified in general to the lack of regularity in the Plaintiffs' approach to business operations, including the fact that the one-time grain storage check made out to Winfield Grain was cashed by James personally. This, along with other examples, indicated a lack of adherence to legal and

business formalities customary in business operations. He also testified as to the lack of customary practices, such as a business plan, projecting revenues and expenses with particularity, obtaining sufficient capital and operating funding, and keeping accurate books and records. Overall, Mr. Reedy opined that there would be no *net revenues* for either side of the business during the applicable time frame. His opinion was buttressed by the fact that the previous owners operated the facility at a loss. (Tr. Vol. 4, 62-95, ECF No. 114) In many respects, Mr. Reedy's testimony was directly contradictory to Mr. Grossman's. To the extent that the two experts offered contradictory advice, the Court finds Mr. Reedy's testimony to be more credible.

33. Ultimately, it was Mr. Reedy's opinion that there is no basis for expecting $100,000 per year, per business. (Tr. Vol. 4, 80-95) The Court finds this opinion credible. Specifically, the previous owners of the facility had been operating at a loss. (Id. at 83) While some of that may be due to the managerial competence of Mr. Loy, which was brought into question at trial, there is no evidence that James would be a more competent manager of a grain facility, especially where he had no previous experience in that business.

*Grain Business*

34. The court finds that Plaintiffs did not have a grain dealer's license. (Tr. Vol. 1, 158, ECF No. 111)

35. No other company uses the same conveyor for grain and sand operations. (Tr. Vol.1, 167)

36. Plaintiffs' overall goal was to contract with someone to run the granary, and use the facility to also dredge for sand, which Mr. James would sell. (Tr. Vol. 1, 127-28, 146-47)

37. Plaintiffs never performed maintenance work on the equipment necessary to run a grain storage and loading facility. (Tr. Vol. 1, 169-171)

38. Plaintiffs did store grain on one occasion. (Tr. Vol. 1, 124). James made $5,384 on December 27, 2010 for "roughly 52,000 bushels." However, he did not have a scale to weigh incoming loads. Such a scale is customary in grain storage operations, and as of trial, James still hadn't fixed the scale. (Id. at 144)

39. In an attempt to put into effect Plaintiffs' business plan of operating a granary and dredging sand, James had initial conversations with Bunge Grain Company ("Bunge") regarding leasing the grain facility. These conversations did not ultimately lead to any commitments by Bunge to lease the facility. However, James contends that this failure is because he was "flooded out" by the 2008 flood. (Tr. Vol. 1, 120)

40. Plaintiffs' one grain storage check was not deposited into the corporate checking account, but instead into the James' personal account. (Tr. Vol. 1, 145)

41. As mentioned above, James purchased the facility from Jersey County, which had been running a grain facility. When purchasing the property, James did not acquire a customer list, future grain contracts, or any financial records from Jersey County. (Stip. at ¶ 19, ECF No. 81)

*Sand Dredging Business*

42. James secured a permit giving him sand dredging rights for 9 or 10 miles on the Mississippi River. The permit expired on December 31, 2012. (Stip. at ¶12)

43. Plaintiffs told the bank they expected $48,000, not $100,000, and James listed of all the people/companies that did not want deals with him, in both a grain and sand capacity. (Tr. Vol. 1, 145-147, ECF No. 111)

44. In preparation for his sand dredging business, James had contacted contractors to perform the dredging for him.  At the same time, he bought a conveyor and dredge himself.  However, he had only partially paid for the conveyor and dredge with help from his brother, trading two tractors for partial payment of the conveyor and dredge. (Tr. Vol. 1, 127-129)

45. The Plaintiffs made no further efforts toward the sand business.  (Tr. Vol. 1, 129)

46. It would have taken at least $200,000 to $300,000 to begin operations on a sand dredging business, funds the Plaintiffs did not have at the time of the allisions.  James' only prospects for acquiring the funds were speculative possibilities of getting the money from family members.  (Tr. Vol. 1, 150-51)

47. The state of the facility up until the second allision was such that a sand dredging operation could have taken place, but Plaintiffs made no effort to do so.  (Tr. Vol. 1, 149-150).

48. At no time after purchase of the facility did James render the facility capable of off-loading dredged sand.  (Stip. at ¶ 21, ECF No. 81)

49. James never loaded a barge with grain at the facility.  He never dredged any sand from his permit area. (Stip. at ¶¶ 22-23)

50. James had a sample of sand from his permit area tested, and it did not meet the relevant state standards for highway construction.  (Stip. at ¶ 24).

## CONCLUSIONS OF LAW

Jurisdiction is uncontested and is proper under Rule 9(h) of the Federal Rules of Civil Procedure and under the statutory grant of admiralty jurisdiction found at 28 U.S.C. §1333.  The substantive law to be applied is federal maritime law because the allision occurred on the

navigable waters of the United States, and thus, the legal rights and liabilities arising from that action are within the reach of admiralty jurisdiction and measurable by the standards of maritime law.  Keramac v. Compagnie Generale Transatlantique, 358 U.S. 625, 628 (1959).  Venue is proper in the Eastern District of Missouri, pursuant to 28 U.S.C. §1391, because a significant portion of the events giving rise to liability occurred in this district.

Fault is not contested by the Defendant for the three allisions described above, and the only issue before the Court is that of the amount of damages.  There are three types of damages at issue: (1) property damages; (2) lost profits damages; (3) prejudgment interest and other ancillary costs.

*Property Damages*

The general rule for calculation of damages in admiralty cases is *restitution in integrum*, which requires putting the injured party in the same position that he would have been in before the damage to his property.  The Baltimore, 75 U.S. (8 Wall) 377, 385 (1869).  Thus, property owners are to be compensated "fully for all losses incurred, in a manner which will restore them to the condition which would have existed had the casualty not occurred."  Complaint of Valley Towing Serv., 629 F. Supp. 139, 145 (E.D. Mo. 1985).  However, courts also apply the "new for old" rule to avoid giving the injured party a windfall by providing a new replacement for something that was old and depreciated and needed to be replaced in any event.  BP Exploration & Oil, Inc. v. Moran Mid-Atlantic Corp., 147 F. Supp. 2d 333, 338 (D. N.J. 2001).  "It violates reason to find that a responsible party should be obligated to replace in a new condition that which was deteriorated prior to the time he became responsible."  Oakdene Compress &

Warehouse Co. v. S.S. Cities Serv. Norfolk, 242 F. Supp. 148, 150 (E.D.S.C. 1965 ) (internal quotations omitted).

In computing compensatory damages, this court must determine whether the damaged property is a total loss or a partial loss, because in the case of "total loss," the measure of damages is generally the market value of the property just before the loss. Pillsbury Co. v. Midland Enters., 715 F. Supp. 738, 763 (E.D. La. 1989). In the case of a "partial loss," the cost of repair is the measure of damages. Aetna Ins. Co. v. United Fruit Co., 304 U.S. 430, 435-36 (1938).

Where "market value" is the measure of damages, a court will generally look to what price it would take to buy a replacement on the open market. Sometimes, this process is straightforward, such as when the property damaged is a standard vessel, which can be bought and sold. In the instance of damage to real property or land-based facilities, however, because there generally is no "market" in which a "replacement" facility can be bought, replacement cost less depreciation is the tool most often used to estimate the market value. See Pillsbury, 715 F. Supp. at 766-68; see also, Orange Beach Water, Sewer & Fire Protection Authority v. M/V/ Alva, 680 F.2d 1374, 1384 (11th Cir. 1982) (finding courts should consider depreciation in computing damages); Bunge Corp. v. American Commercial Barge Lines Co., 630 F.2d 1236, 1241-42 (7th Cir. 1980) (noting district court correctly computed damages based on the replacement costs less depreciation where facility's current function was diminished from prior usefulness).

The Court notes at this point that the parties have argued about the appropriateness of reductions for depreciation in computing these damages. The Defendant cites numerous cases in

which replacement cost must then be reduced by depreciation; and then Plaintiffs cite an equal number of cases where courts have refused to include depreciation.

This Court finds that the cases can generally be reconciled, and that the general measure of market value is replacement cost minus depreciation. However, depreciation is inapplicable where the replacement does not increase the value or useful life of the property, or where the replaced part is a component of an integral whole, and that unitary whole will not be increased in value or useful life. See Brunet v. United Gas Pipeline Co., 15 F.3d 500, 505 (5th Cir. 1994) (holding no depreciation where useful life of property as existed before collision is not extended; when the whole pipeline eventually needed replacing, these pieces would also need replacing); Weyerhaeuser Co. v. Atropos Island, 777 F.2d 1344, 1352 (9th Cir. 1985) (finding no depreciation should be deducted where nothing of substance is added to the overall value of a structure, but should be deducted for damage to a non-integral part of the structure).

These exceptions to the general rule requiring depreciation are in accord with the principle of *restitution in integrum* because in these situations, the plaintiff is not left in a better position post-injury relative to pre-injury.

In the instant case, the burden is on the James' to prove the extent of their damages, including the actual value of any item damaged just prior to the injury. BP Exploration & Oil, Inc. v. Moran Mid-Atlantic Corp., 147 F. Supp. 2d 333, 337 (D. N.J. 2001). However, where Marquette asserts that the value of the property is less than the cost of repairs, it has the burden of establishing that fact. Id.

The May 2010 allision, resulted in a constructive total loss to pile clusters 6 and 5A. Thus, the Court must determine the market value of those pile clusters just before the loss.

Pillsbury, 715 F. Supp. at 763. The Court will use replacement cost minus depreciation, because new pile clusters will be more valuable than the old ones, thus requiring the general rule of "new for old" to be applied here. The exceptions to that rule are inapplicable.

Evidence presented at trial shows that the cost to replace the two pile clusters would be $50,000 each. (Tr. Vol. 3, 100, ECF No. 113) Pile cluster 6 was installed in 1964, and because the evidence at trial showed that the useful life of these structures was 45 years, the pile was fully depreciated by 2009, and its market value was zero. (Tr. Vol. 3, 101-02) Pile cluster 5A was installed in 2003. Thus, the pile cluster had used up 8 years of useful life when it was destroyed in 2011. The Plaintiffs are entitled to recover $42,220 for this pile cluster. (Tr. Vol. 3, 102-04)

After the subsequent allisions in July of 2011, Plaintiffs assert that their damages are $809,500.00 for repair of the facility; and in addition, they will require $17,250.00 to rebid the repair work; $24,285.00 for the payment of construction supervision fees; and $21,921.00 in order to restore the amount that they have already spent on bidding and surveying charges. All of these damages, which are only to a portion of the property, the dock and loading apparatus, substantially outweigh the value of the entire property at the time of the first allision, in May of 2011. Thus, this Court finds that the facility was a constructive total loss after the July 2011 allisions.

In those circumstances, the Plaintiffs are only entitled to the value of the property at the time the injuries were incurred. Compl. Of Valley Towing Serv., 629 F. Supp. At 145; BP Exploration & Oil Inc., 147 F. Supp. 2d at 337. From this value, the Court must subtract the value of those portions of the property that were undamaged: the 22 acres of land, undamaged

silos, undamaged buildings, etc. The court must also subtract for the depreciation of the river dock and the entirety of the loading apparatus, because if it were replaced, it would enhance the useful life of the loading apparatus. In other words, the Court is following the generally applicable "new for old" rule outlined above.

Because the Court has found that the useful life of a greenheart pile is 45 years, the Court finds that pile clusters numbers 3 and 4, installed in 1964, were fully depreciated at the time of the July 2011 allisions, and thus, that their pre-injury market value was $0. (Tr. Vol. 3, 157-58, ECF No. 113) The Court also finds that pile clusters 1 and 2, installed in 1983, had 15 years of useful life remaining, and that their value was $18,889 each. (Tr. Vol. 3, 113)

The other portions of the loading apparatus which suffered damage as a result of the July 2011 allisions were the loading hopper (tower), conveyor, control house, and "additional support structures" for the loading apparatus. The Court finds on the basis of expert testimony and exhibits introduced into evidence at trial that there was $23,529 worth of damage to the loading hopper (tower); that the conveyor system was totally destroyed and worth $63,765 before the incidents; that the control house was totally destroyed and worth $2,640 before the incidents; and that there was an additional $15,804 worth of damage to the additional support structures. (Def.'s Ex. W-2, 15) In total, the damage to the conveyor apparatus and loading facilities as a result of the July 2011 allisions, including the dolphins that still had remaining useful life prior to the 2011 incidents, equals $143,516.

Thus, the Court concludes that the Plaintiffs' calculations of damages are inappropriate. If the Court allowed that amount of recovery, the Plaintiffs would gain a windfall of several hundred thousand dollars because they would have a brand new facility. Plaintiffs would be left

in a far superior position that they would have been in but for the accident, in violation of the principle of *restitution in integrum*.

The total amount of damages to physical property for all three incidents is thus $185,736.

*Lost Profits Claims*

The general principles of lost profits claims in admiralty require that such damages not be "too remote, speculative, and uncertain." Cargill, Inc. v. Taylor Towing Serv., Inc., 642 F.2d 239, 241 (8th Cir. 1981) (citing Fireside Marshmallow Co. v. Frank Quinlan Construction Co., 213 F.2d 16, 18-19 (8th Cir. 1954)). In order to recover lost profits in a maritime case, "the plaintiff must present proof sufficient to bring the issue outside the realm of conjecture, speculation or opinion unfounded on definite facts." Cargill. 642 F.2d at 241.

To meet this standard, a plaintiff must prove two elements: first, they must "prove that profits 'have actually been, or may be reasonably supposed to have been, lost[;]'" and second, "the amount of lost profits must be 'proven with reasonable certainty.'" ConAgra, Inc. v. Inland River Towing Co., 252 F.3d 979, 983 (8th Cir. 2001) (quoting The Conqueror, 166 U.S. 110, 125 (1897)).

Of these two elements, the first one is scrutinized more strictly. Thus, once profits are proven to have been lost, "'the fact that the exact amount is difficult to determine should not deprive [a party] of its right to recovery.'" Id. (quoting Mid-American Transp. Co. v. Cargo Carriers, Inc., 480 F.2d 1071, 1074 (8th Cir. 1973)). However, to properly estimate lost profits, the Court requires evidence indicating reasonably anticipated revenues for the grain and sand dredging operations and the expenses associated with each business. Racicky v. Farmland Indus., Inc., 328 F.3d 389, 398-99 (8th Cir. 2003).

Here, the Court concludes that Plaintiffs have not proven that they lost, or may reasonably have lost, profits. Further, "the amount of profits" has not been "proved with reasonable certainty," even under the relaxed standard of specificity required under <u>ConAgra</u>. The evidence presented by the Plaintiffs regarding the proposed grain business centered on the testimony of Jeff Geisendorfer of the Lincoln County Farmers Cooperative. Mr. Geisendorfer testified that he *may* have moved 160,000 bushels of grain. He did not in fact commit to doing business with the Plaintiffs in the future. There was no general course of dealing between the parties, apart a one-time grain storage in the fall of 2010, by which a volume of transactions could be estimated. There were no contracts between the parties. Indeed, there were no contracts with any party to store grain or to load grain at the Winfield facility, or even any contacts that progressed beyond the stage of preliminary inquiry. The parties simply speculated on potential future courses of action without binding themselves.

The Court also finds relevant that the previous owners of the facility, who were professionals in the grain storage and trading business, could not run a profitable grain business from this facility. The Court finds that it is mere speculation that the Plaintiffs, who had no experience in the grain industry, did not keep accurate books and records, and did not track expenses, could run a profitable grain business from that same facility.

The evidence presented by the Plaintiffs regarding the proposed sand business centered on the testimony of Kenneth Schreiter, President of Schreiter Ready-Mix, and other businesses who buy sand for their operations. The Court similarly finds here that there were no binding commitments by third parties to do business with the Plaintiffs, or even any contacts that advanced beyond the stage of preliminary inquiry. Any potential future courses of action were

merely speculative and did not contractually bind Plaintiffs and any other businesses to purchase sand from Plaintiffs..

The scenario here differs from the cases cited by Plaintiffs to justify the lost profits claims. For example, in Rogers Terminal & Shipping Corp. v. Int'l Grain Transfer, Inc., 672 F.2d 464 (5th Cir. 1982), a floating grain elevator was damaged and then underwent repair. The court awarded as damages the profits that the elevator would have made but for the downtime to repair. Id. at 467-68. In that case, there were multiple similar floating grain elevators operating in the same area, under similarly professional management, along with concrete testimony as to the amount of grain that would be in that market. Id. at 467. This evidence helped to provide a basis for the profits estimate of the damaged grain elevator. Id. In addition, evidence existed regarding profitable activity both before and after the repair. Id. at 467-68. In the present case, however, James is not a similarly professional manager of a grain facility, and there are no similar businesses by which to gauge the profitability of this new undertaking.

Similarly, in Miller Indus. v. Caterpillar Tractor Co., 733 F.2d 813 (11th Cir. 1984), another case relied upon by the Plaintiffs, a fishing boat experienced downtime for repairs that were attributable to the defendant. The court found the loss profits of the fishing boat were recoverable where there was specific evidence of the profitability of three similar boats. Id. at 822. Further, "[t]he appropriateness of the other vessels' catches for comparison was demonstrated" by the fact that all four boats had similar profitability when they were all in business. Id. No similar measurement is available in this case, leaving the Court with the conclusion that Plaintiffs' ability to make profits is mere speculation.

Alternatively, although the Court does not believe that the Plaintiffs would have had profits after deducting expenses from either business, the Plaintiffs claim fails because James cannot prove the amount of lost profits with reasonable certainty. Although James presented some evidence as to what he thought he might earn as gross revenues from a grain storage transaction or possible sand dredging transaction, he presented no competent evidence regarding the expenses that the transactions would incur. Without an idea of likely expenses, the Court is unable to determine lost profits. This court only has evidence as to potentially lost gross revenue and has no basis for calculating profitability. "Anticipated profits are recoverable only when the claim is substantiated on proof of income and expenses prior to interruption of the business enterprise." Cargill, 642 F.2d at 241. Thus, although case law permits recovery for lost profits claims even where some uncertainty exists as to the amount of the profits, such is not the situation here, where Plaintiffs have presented no basis for calculating profits from its potential undertakings. The Court therefore finds that the Plaintiffs are not entitled to recover under a lost profits theory.

*Prejudgment Interest and Ancillary Costs*

The general rule of the Eighth Circuit in admiralty cases is that prejudgment interest should be routinely awarded in the absence of exceptional or peculiar circumstances. Cargill, Inc. v. Commercial Union Ins. Co., 889 F.2d 174,181 (8th Cir. 1989). "Peculiar or exceptional circumstances have been found to exist in cases where there was unreasonable delay in the prosecution of the litigation, bad faith estimate of damages, or no actual damage." BP Exploration & Oil Inc., 147 F. Supp.2d at 346 (citation omitted).

The underlying purpose for presumptively awarding prejudgment interest is to "ensure that an injured party is fully compensated for its loss" City of Milwaukee v. Cement Division, National Gypsum Company, 515 U.S. 189, 195 (1995). The Supreme Court held that "[f]ull compensation has long been recognized as a basic principle of admiralty law, where "[r]estitutio in integrum is the leading maxim applied by admiralty courts to ascertain damages resulting from a collision.'" Id. (quoting Standard Oil Co. of N.J. v. S. Pac. Co., 268 U.S. 146, 158 (1925)).

In this case, Plaintiffs are entitled to prejudgment interest from the time of the injuries, because of the general presumption in favor of such an award, and because no "peculiar" or "exceptional" circumstances justify departure from that general rule. The Court finds that the plaintiffs never delayed the prosecution of its claims. Shortly after the incident, the Plaintiffs took steps to ascertain their damages, and alerted Marquette to the damage to their facility. They undertook a blind bid for repairs of the facility within a reasonable time, indicating a good-faith attempt to prosecute the claim. Further, although the Court disagrees with the amount of compensatory damages claimed by the Plaintiffs, the claims were not frivolous given the lack of clarity as to when depreciation applies, and the fact that they relied on repair estimates submitted by contractors. Thus, no circumstances exist which would preclude the Plaintiffs from being eligible for prejudgment interest on their claim.

The Court concludes that the rate of prejudgment interest to be applied in admiralty cases, and whether that interest is to be compounded annually, is within its sound discretion so that the Court can compensate the Plaintiffs for the loss of use of money from the time the claim accrues. Cement Div., Nat'l Gypsum Co., 515 U.S. at 194-96. Therefore, a prejudgment rate set at the average prime rate, compounded over the period of the loss is reasonable, appropriate, and the prevailing view for just compensation for a damaged plaintiff. BP Exploration & Oil Inc.,

147 F. Supp. 2d at 347; Cement Div., Nat'l Gypsum Co. v. City of Milwaukee, 144 F.3d 1111, 1116-17 (7th Cir. 1998). Thus, the Plaintiffs are entitled to prejudgment interest on its damages at the average prime rate from May 2010 on the damages to Pile Cluster 5A, and prejudgment interest on its damages at the average prime rate from July 2011 on the remainder of the compensatory damages to the date of this judgment, said interest to be compounded annually. Ingram Barge Co. v. Lewis & Clark Marine, Inc. 504 F. Supp. 2d 665, 679-80 (E.D. Mo. 2007).

Thus, the total amount of damages recoverable by the Plaintiff in this case is $185,736. This amount is subject to prejudgment interest at the average federal prevailing rate, compounded annually.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs shall have judgment against Defendant and that Defendant shall pay to the Plaintiffs $42,220 subject to prejudgment interest at the prevailing average federal rate from May, 2010, said interest to be compounded annually.

**IT IS FURTHER ORDERED** that Defendant shall pay to the Plaintiffs $143,516 subject to prejudgment interest at the prevailing average federal rate from July, 2011, said interest to be compounded annually. A separate entry of Judgment is entered forthwith.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  24th  day of September, 2014.